**Noah S. CUTRER and Nicholas D. Olivier**

v.

**HUMBLE OIL & REFINING COMPANY.**

Civ. A. No. 8842–B.

United States District Court
E. D. Louisiana,
New Orleans Division.

April 20, 1964.

Arthur C. Reuter, New Orleans, La., for plaintiffs.

Charles Janvier, Bernard J. Caillouet, W. J. McAnelly, Jr., Andrew McCollam, Jr., H. H. Hillyer, Jr., L. K. Benson, New Orleans, La., for Humble Oil & Refining Co.

Murphy Moss, New Orleans, La., for National Bank of Commerce.

FRANK B. ELLIS, District Judge.

This is phase three involving an oil and gas lease from the plaintiffs to Humble Oil & Refining Company covering a substantial acreage in and around Stone Island and a portion of the West Black Bay Field in Plaquemines Parish, Louisiana.[1] The acreage involved embraces some 1920 acres of which all but about one hundred acres are submerged. This is the source of the difficulty,[2] for the State of Louisiana has previously issued a conflicting lease, State Lease # 195, originally dated February 28, 1928, bearing the designation "QQ". This State lease is presently owned in equal shares by the Gulf Oil Corporation, as operator, and the Estate of William Helis, and covers all state lands and water bottoms in a large tract which includes the areas here involved.[3]

1. See Cutrer v. Humble Oil & Refining Company, E.D.La., 192 F.Supp. 757, and Cutrer v. Humble Oil & Refining Company, E.D.La., 202 F.Supp. 568, affirmed, 309 F.2d 752, cert. den. 372 U.S. 936, 83 S.Ct. 883, 9 L.Ed.2d 767; hereafter referred to as Cutrer I and Cutrer II respectively.

2. "It has been the public policy of the State of Louisiana at all times since its admission into the Union that all navigable waters and the beds of same within its boundaries are common or public things and insusceptible of private ownership; that no act of the Legislature of Louisiana has been enacted in contravention of said policy, and that the intent of the Legislature of this state at the time of the enactment of * * * R.S. 9:5661, and continuously thereafter was and is at this present time to ratify and confirm only those patents which conveyed or purported to convey public lands susceptible of private ownership of the nature and character, the alienation or transfer of which was authorized by law but not patents or transfers which purported to convey or transfer navigable waters and the beds of same." LSA–Revised Statutes, Title 9, Section 1107 (Act 727 of 1954, Section 1).

"Any patent or transfer heretofore or hereafter issued or made is null and void, so far as same purports to include such navigable waters and the beds thereof, as having been issued or made in contravention of the public policy of this state and without any prior authorization by law; * * *." LSA–Revised Statutes, Title 9, Section 1108 (Act 727 of 1954, Section 2).

"No statute enacted by the legislature of Louisiana shall be construed as to validate by reason of prescription or peremption any patent or transfer issued by the state or any levee district thereof, so far as the same purports to include navigable or tide waters or the beds of same." LSA–Revised Statutes, Title 9, Section 1109 (Act 727 of 1954, Section 3).

3. The acreage involved is the NW¼, SW¼ and SE¼ of Section 18; the NE¼ and SW¼ of Section 19; the NW¼, SW¼ and SE¼ of Section 20; and all of Section 31; all located in Township

Plaintiffs' 5-year lease was executed in December of 1953; however there is a serious question concerning the plaintiffs' title to the minerals in the water bottoms, which would normally belong to the state.[4] Humble was understandably reluctant to explore the water bottoms within the lease until the matter was settled; did no drilling and to keep the lease in force paid delay rentals.

Prior to the lease in suit Gulf, as a co-lessee from the State, had already drilled producing wells on the premises it leased from the State, which includes the entire tract here involved, with the exception of Section 31.

Late in 1958, with the lease about to expire, Humble entered into a joint operating agreement with the State's lessees for the development of Stone Island and the immediately surrounding water bottoms, unitized under orders of the Louisiana Department of Conservation. This suit for cancellation was filed on March 9, 1959.

In Cutrer I, the matter was before the Court on plaintiffs' motion for cancellation of the lease for non-payment of royalties. The motion to cancel was denied grounded on the fact that Humble's position was, at worst, erroneous.

In Cutrer II, the Court was persuaded that defendant should not be compelled to assume the risk of making royalty payments until plaintiffs' title to the submerged portions of the lease was confirmed or in some way settled, and concluded, stating:

"Accordingly, as soon as an escrow plan can be established, Humble will deliver all accrued royalties attributable to the joint area water bottoms within the lease, and will henceforth pay into that fund all such royalties, at least quarterly, until such time as the plaintiffs' title is quieted or defeated, or until the further orders of the court. The court will retain jurisdiction of the case for reconsideration should any-

thing prevent a prompt adjudication of the title question by the state tribunals." Cutrer II, supra, 202 F.Supp. at page 574.

The motivating force behind this procedure as established by the Court as then constituted, was concern over the basic principal that "there is no protection for a mineral lessee who pays royalties erroneously on minerals produced from state lands, and because the state proceedings presently pending between plaintiffs and Gulf may soon resolve the basic title question." Cutrer II, supra, 202 F.Supp. at page 574. The applicable statutory provisions of the law of Louisiana are:

"It shall be unlawful for a person acquiring mineral rights from, or mineral rights under a lease by, the last record owner and holding under an instrument sufficient in terms to transfer title or for a person purchasing mineral products to withhold payment of any rentals, royalties or other sums due to a party holding an interest in the minerals, or under the lease." LSA-Revised Statutes, Title 30, Section 105. (Act 64 of 1934, Section 1.)

"A. A person producing minerals under a lease granted by the last record owner and holding under an instrument sufficient in terms to transfer title to the land or mineral rights, shall be presumed to have derived his right from the true owner. The lessor, royalty owner, lessee or producer or persons holding from them shall be entitled to all minerals produced or to their proceeds, unless and until a suit testing title of the land or mineral rights embraced in the lease is filed in the district court of the parish in which the property is located.

"B. A purchaser of minerals produced from a recorded lease granted under these conditions shall be fully protected in making pay-

---

17 South, Range 17 East. Section 31 is not included in State Lease 195.

4. See Footnote 2, supra.

ment to any party in interest under the lease unless and until the above mentioned suit should be filed and the purchaser receives notification of it by the usual postal registry receipt card. The purchaser shall not be entitled to this protection unless he has recorded in the conveyance records of the parish in which the land is located, notice that the minerals have been and will be bought by him." LSA–Revised Statutes, Title 30, Section 106. (Act 64 of 1934, Section 2).

"R.S. 30:105–30–106 shall not apply to minerals produced from lands belonging to the state." LSA–Revised Statutes, Title 30, Section 108. (Act 64 of 1934, Section 6; Act 24 of the Extra Session 1935, Section 2).

The opinion in Cutrer II was dated February 20, 1962, and the reference to "proceedings presently pending between plaintiff and Gulf" was reference to Noah S. Cutrer and Nicholas D. Olivier v. Gulf Oil Corporation, Civil District Court for the Parish of Orleans,

Louisiana, Number 366–650, filed November 13, 1958. To round out the historical facts it should be mentioned that a third suit was filed.[5]

Cutrer II was appealed and affirmed on November 28, 1962, in a Per Curiam opinion stating: "Finding ourselves in accord with the findings and conclusions of the district court as set forth in its opinion, we affirm its judgment for reasons which it has assigned. Affirmed." Humble Oil & Refining Company v. Noah S. Cutrer and Nicholas D. Olivier, 5 Cir., 309 F.2d 752. On March 4, 1963, the Supreme Court denied certiorari, Humble Oil & Refining Company v. Cutrer, et al., 372 U.S. 936, 83 S.Ct. 883, 9 L.Ed. 2d 767.[6]

[1] Thereafter, on March 15, 1963, plaintiffs filed a motion to hold defendant in contempt for failure to make payment to the National Bank of Commerce in New Orleans, the designated Escrow Agent, the sums represented by a royalty of 7/64th of production.[7]

This brings us to Cutrer III which is plaintiffs' motion to have escrow agent pay out funds deposited to

5. Noah S. Cutrer, et al. v. Manning Oil Corporation, 25th Judicial District Court for the Parish of Plaquemines, Louisiana, Nos. 4737 and 4738, filed July 16, 1958. This was a litigious matter wherein the present plaintiffs sought to quiet their title as against a group of persons and corporations, referred to as the Perez Group, who claimed all of the acreage here involved under tax sales and had granted a mineral lease to Helis. A consent judgment was obtained recognizing their (plaintiffs') ownership in return for conceding their opponents (the Perez Group) certain small mineral royalties.

6. During the interim one of the plaintiffs, Dr. Noah S. Cutrer, died and his estate was opened under docket Number 16,150, 19th Judicial District Court, Parish of East Baton Rouge, Louisiana. The Court, In the Matter of The Succession of Dr. Noah S. Cutrer, appointed and confirmed Mrs. Lillian C. Stevens as testamentary executrix. She was substituted as a party plaintiff herein on March 13, 1963.

7. This motion was predicated upon a judgment signed on March 30, 1962, by this

court, as then constituted, wherein Judge Wright, in paragraph D thereof, stated: "Upon this judgment becoming *final and executory*, defendant shall * * * make payment to the hereafter designated 'Escrow Agent' of the sums represented by a royalty * * * of $\frac{7}{64}$th of production attributable to the water bottoms * * * within that portion of the 'joint area', etc., "and upon the mistaken belief that the denial of certiorari by the Supreme Court was "*final and executory*" within the purview of the judgment of March 30, 1962.

Supreme Court General Rule 58, wherein it is provided in Paragraph 2 that "[a] petition for rehearing of orders on petitions for writs of certiorari may be filed with the clerk in term time or vacation, subject to the requirements respecting time * * * as provided in paragraph 1 of this rule[,]" and Paragraph 1 which provides, in respect to time that "[a] petition for rehearing * * * may be filed with the clerk in term time or in vacation, within twenty-five days after judgment or decision, unless the time is shortened or en-

plaintiffs.[8] While there is no authority in the Federal Rules for such a motion the court will disregard this procedural irregularity and treat the motion as one for summary judgment.[9]

Plaintiffs state that they are entitled to a release of the monies held in escrow because they have been *prevented from having a prompt adjudication* of the "title question" by the state tribunals.[10] Plaintiffs argue that in the trespass action Gulf has failed to call its lessor, the so-called adverse claimant, the State of Louisiana, in warranty to defend; nor has it, Gulf, in any other manner sought to make the State a party to that litigation. This, plaintiffs' claim, constitutes an active prevention of the prompt adjudication of the title question by the state tribunals.

This position is untenable. First of all, while there may be some obligation on Gulf to call its lessor in warranty[11] it is not incumbent upon this court to pick the brains of the Gulf Oil Corporation as to why they have not called the State of Louisiana or its Mineral Board in warranty to defend. (The amenability of the State of Louisiana to a suit of this nature will be discussed in subsequent paragraphs.)

Secondly, the Court would like to point out that while the action now pending in the State Court is one of ejectment (referred to as one of trespass) plaintiffs may amend that petition[12]; they may file a supplemental petition[13] so as to style it an action to quiet title or one to remove a cloud therefrom.

larged by the court or a justice thereof."
The judgment of March 30, 1962, did not become *final and executory* until March 29, 1963, the expiration date of the twenty-five day mandate in General Rule 58 (1). Plaintiffs' motion for contempt was denied on March 20, 1963.

8. At present there is about $335,277.87 on deposit with The National Bank of Commerce in New Orleans, Escrow Agent.

9. Federal Rules of Civil Procedure, Rule 56, 28 U.S.C.A. Whether or not the matter is one which should have been more properly handled by way of supplemental complaint (Federal Rules of Civil Procedure, Rule 15(d)) followed by a motion for summary judgment is an open question which the Court shall also ignore in lieu of the above.

10. The concluding sentence of Cutrer II states that "[t]he court will retain jurisdiction of the case for reconsideration should anything prevent a prompt adjudication of the title question by the state tribunals."
This sentence was footnoted as follows: "It may be that the fundamental title question cannot be resolved in that proceeding [Noah S. Cutrer and Nicholas D. Olivier v. Gulf Oil Corporation, supra] against one of the state's lessees. Though the lessor, the State Mineral Board is amenable to suit, LSA–R.S. 30:121; Texas Company v. State Mineral Board, 216 La. 742, 44 So.2d 841, the state itself, presumably immune in the absence of consent, is perhaps an indispensable party in the title dispute. See Daigle v. Pan American Production Company, 236 La. 578, 108 So.2d 516."

11. "If the persons by whom those acts of disturbance have been committed, pretend to have a right to the thing leased, or if the lessee is cited to appear before a court of justice to answer to the complaint of the person thus claiming the whole or a part of the thing leased, or claiming some servitude on the same, he shall call the lessor in warranty, and shall be dismissed from the suit if he wishes it, by naming the person under whose rights he possesses." LSA–Civil Code, Article 2704.

12. "A plaintiff may amend his petition without leave of court at any time before the answer thereto is served. * * * Otherwise, the petition and answer may be amended only by leave of court or by written consent of the adverse party." LSA–Code of Civil Procedure, Article 1151.

13. "The court, on motion of a party, upon reasonable notice and upon such terms as are just, may permit mover to file a supplemental petition or answer setting forth items of damage, causes of action or defenses which have become exigible since the date of filing the original petition or answer, and which are related to or connected with the causes of action or defense asserted therein." LSA–Code of Civil Procedure, Article 1155.

Even if the motions to amend or supplement the original petition are denied, plaintiffs are still not foreclosed from adjudicating the title question in the state courts for they may institute an entirely new state action against both Gulf and the State Mineral Board.

■ Nor can it be any longer seriously questioned that the State Mineral Board is immune from suit in an action to quiet title or to remove a cloud therefrom, Walsmley v. Pan American Petroleum Corporation, 244 La. 513, 153 So.2d 375.

■ It would also appear from the Louisiana jurisprudence in point that the action to quiet title is synonymous with the action to remove a cloud therefrom. "It is neither petitory nor possessory, nor is it one in jactitation nor one to try title under Act 38 of 1908 (LSA–R.S. 13:5062). Having no codal or statutory background, it is an innovation of our jurisprudence. In an action to remove a cloud * * * possession is not necessary in either plaintiff or defendant. A plaintiff may sue for the cancellation of a recorded deed, mineral

lease or other recorded instrument which allegedly operates as a cloud on his title, and *the issue of title may be determined as incidental to plaintiff's right to have the alleged cloud removed.* In such an instance the relief sought is not that the defendant be ordered to disclaim title or make good the asserted title—the peculiar characteristic of an action in jactitation—but the cancellation and erasure from the public records of a recorded instrument operating as a cloud on plaintiff's title." Daigle v. Pan American Production Company, 236 La. 578, 108 So.2d 516. (Italics supplied)

■■ Plaintiffs further contend that the State of Louisiana is immune from a suit of this nature. The Court agrees, Cobb v. Louisiana Board of Institutions, 229 La. 1, 85 So.2d 10; however the question of whether or not the State of Louisiana can be sued without its consent in matters arising out of the leasing of its lands for exploration for minerals is, historically, an interesting one [14], but there is no need to delve further into this problem in lieu of Walmsley, which has been discussed and is accepted by this Court as the living law.

14. Earlier cases dealing with the problem disregarded the sovereign immunity rule and allowed suit to be filed against the state, with or without its consent, State ex rel. Shell Oil Company v. Register of State Land Office, 193 La. 883, 192 So. 519, and Begnaud v. Grubb & Hawkins, 209 La. 826, 25 So.2d 606. The underlying theory of those cases in piercing the iron curtain of sovereign immunity was that the doctrine " * * * overlooks the fact that while the State possesses legislative, public and governmental power in the exercise of which it is a sovereignty and governs its people, it also possesses proprietary and quasi private power conferred upon it not for the purpose of governing its people but for the private advantage of the inhabitants of the the State itself as a legal personality. This distinction in the powers of the State was pointed out in the case of State ex rel. Shell Oil Co[mpany]. v. Register of State Land Office, 193 La. 883, 192 So. 519. In that case this Court held that when the State executed a mineral lease it was acting in its *proprietary or quasi private capacity and that having accepted the benefits*

*under the lease it could not escape its obligations—among which was the obligation of warranty."* Begnaud v. Grubb & Hawkins, supra, at page 833 of 209 La. and at page 608 of 25 So.2d.

This court finds that Shell expresses a correct statement of Louisiana law and that Cobb v. Louisiana Board of Institutions, (229 La. at page 13, 85 So.2d 10), (supra), does not overrule but seeks to distinguish the Shell case.

In Cobb, the Louisiana Supreme Court seemed to re-establish the doctrine of total immunity from suit without consent.

However, in an excellent dissent, in Cobb, Justice Moise of the Supreme Court of Louisiana asserts that the Cobb opinion was based on the law of medieval England "that 'the King can do no wrong'." Only four members of the Cobb court as then constituted are still sitting and whether the distinguished new members thereof would still adhere to the medieval law of England remains to be seen. The Begnaud case, supra, is manifestly contrary to all other jurisprudence on the subject and cannot be perpetuated.

Plaintiffs further contend that ·defendant, Humble Oil & Refining Company, intervened in the state court proceedings in October of 1959, and has undertaken no action in that suit from then until now which would bring about an adjudication of the "title question." This allegation is without merit. LSA–Code of Civil Procedure, Article 1094, provides that "[a]n intervenor cannot object to the form of the action, to the venue, or to any defects and informalities personal to the original parties." [15]

Plaintiffs' last contention is that a judgment of this Court ordering the payment of these past due royalties to plaintiffs affords absolute protection to the mineral lessee against dual payment, citing State ex rel. Muslow v. Louisiana Oil Refining Corporation, La.App., 176 So. 686, affirmed, Arkansas Fuel Oil Company v. La. ex rel. Muslow, 304 U.S. 197, 58 S.Ct. 832, 82 L.Ed. 1287, and State ex rel. Bean v. Caddo Crude Oil Purchasing Company, La.App., 189 So. 333, for the proposition that:

"Respondent, as stakeholder, should be concerned only with protecting itself against the danger of being exposed to double liability for the price of the oil. When made secure against such a contingency, its anxiety should be allayed. Payments to relators under a decree of court will shield it completely against the evil day of double payments."

This contention is without merit. All of the cases cited by plaintiffs deal with private parties involved in matters litigious over private lands. None of the cases involved water bottoms which may, or may not be owned by the State.[16]

Thus, the Court must end Cutrer III with basically the same paragraph and conclusion as expressed in Cutrer II, that is, the Court will retain jurisdiction of the case for reconsideration should anything prevent a prompt adjudication of the title question by the state tribunals, or until such time as the plaintiffs' title is quieted or defeated.

So ordered.

---

15. The Official Revision Comments following this article indicate that it is a codification of the jurisprudential rule that an intervenor takes the proceedings as he finds them, Cahn v. Ford, 42 La.Ann. 965, 8 So. 477; Parish v. Holland, 166 La. 24, 116 So. 580; he cannot retard the progress of the main action, General Motors Acceptance Corporation v. Jordan, La.App., 65 So.2d 627; cannot urge defenses personal to the defendant; Devant v. Pecou, 13 La.App. 594, 128 So. 700, Chandler v. Burkhalter, 10 La.App. 575, 121 So. 353; cannot urge matters that would go to dismissal of the suit; Seib v. Cooper, 170 La. 105, 127 So. 380; and, his rights are only limited to the protection of his own interests, Parish v. Holland, supra.

16. See Footnote 2, supra, setting forth the tests of LSA–R.S. 30:105, 106 and 108.